<u>NOT FOR PUBLICATION</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

_____ :
                                       :
TERENCE THOMPSON,                      :
                                       :   Civil Action No. 11-7164 (RMB)
              Petitioner,              :
                                       :
         v.                            :            **OPINION**
                                       :
CHARLIE WARREN, et al.,                :
                                       :
              Respondents.             :
_____ :

**BUMB**, District Judge:

　　This matter is before the Court upon Terence Thompson's §
2254 Petition (the "Petition"), Respondents' answer and
Petitioner's traverse.  For the reasons detailed below, the
Petition will be denied as to all Petitioner's claims raised in
the Petition, as well as those raised in Petitioner's post-
pleading motions.  This Court's decision as to Petitioner's
traversed claim (challenging his counsel's performance on the
grounds that Petitioner was unaware of his maximum sentencing
exposure at the time he rejected the prosecutor's plea offer)
will be reserved, and the parties will be directed to file
supplemental briefs as to that claim.  The Court's decision as to
whether an evidentiary hearing is warranted, and whether a
limited appointment of counsel to Petitioner is required for the

purposes of such hearing, will also be reserved, subject to resolution upon the parties' supplemental briefing.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In July 1996, Michael Lamb ("Lamb"), a drug dealer operating in Camden, tried to purchase cocaine from another drug dealer, Juan Collado ("Collado").  Collado was staying at the apartment of Richard Almanzar ("Almanzar"), who assisted Collado with drug sales.  Collado and Almanzar made acquaintances with another drug dealer, Ronnie Leary ("Leary"), and with Petitioner.[1]  In the early evening hours of July 31, 1996, when Collado was in Leary's company, Lamb paged Collado inquiring about purchasing one and one-half kilos of cocaine.  Leary, being told of the page: (a) opined that Lamb would purchase drugs from Collado once or twice and then either rob or kill Collado; and (b) offered to rob Lamb "preemptively," i.e., instead of selling him cocaine.  Collado agreed and set up a meeting with Lamb for later that night.

The plan was for Collado and Almanzar to meet Lamb, check the money and lead Lamb to the bushes, where Leary and Petitioner would rob him.  However, when Collado and Almanzar actually led

---

[1]  Collado was an intermediary dealer selling to "street-level" dealers, who then sold drugs to individual buyers.  Since Collado needed a car for operating his drug sales in Camden, Leary, who had a used Buick for sale, sold it to Collado and that sale facilitated a trust relationship between Collado and Leary. On the night of July 31, 1996, Collado and Almanzar went to a pizzeria and parked their Buick next to Leary's minivan, where Petitioner was Leary's passenger.  Leary introduced Petitioner to Collado and vouched for Petitioner's "trustworthiness."

Lamb to where Leary and Petitioner were hiding, Lamb saw Petitioner coming at him, pulled out his gun and shot Petitioner in the abdomen.  When Petitioner began wrestling with Lamb, Leary shot Lamb.  Although Lamb was already on the ground, Petitioner and Leary continued shooting Lamb in plain view of Collado and Almanzar, who heard Lamb screaming.  Collado then grabbed Lamb's money, and he and Almanzar ran to their Buick, while Leary and Petitioner got into Leary's minivan, and both cars drove to an area outside the apartment complex where Almanzar lived.[2]

Since Petitioner was shot, Leary took him to a hospital, telling Collado and Almanzar that he would meet with them later to divide the money.[3]  Collado and Almanzar were soon questioned by police officers who had received reports of gunfire.  The officers also recovered casings at the scene of the crime, and bullets were recovered from Lamb's body during his autopsy, which revealed thirteen lethal wounds.  Collado and Almanzar were arrested for their involvement in the homicide, and Leary was arrested a week later, after admitting his involvement.

Three months after the murder, an investigator visited Petitioner at the hospital in response to Petitioner's call

---

[2]  Although Collado promised Lamb to sell cocaine for $19,000, the bag of cash brought by Lamb contained only $15,000.

[3]  When Leary returned after leaving Petitioner at the hospital, the money was split up.  Collado and Almanzar got $3,500 each, while Leary and Petitioner were allocated $4,000 each.

stating that he wished to talk about Lamb's murder.[4]  During that visit, Petitioner told the investigator a story where Leary was purchasing cocaine from Lamb when "the commotion jumped off," and Petitioner, after getting accidentally shot by Lamb, shot Lamb back since it was Petitioner's "natural reaction."

Two days later, after Petitioner was released from the hospital and settled at his girlfriend's apartment, he called and asked for another meeting with the investigator.  During that second encounter, he confessed and provided a detailed account of the plan to rob Lamb, the robbery itself and Lamb's murder. Petitioner also admitted that the story he told during the investigator's visit at the hospital was false.  His second account corresponded to those provided by Collado and Almanzar.[5]

Three years passed by.  By that time, having been charged with Lamb's murder, armed robbery, felony-murder, conspiracy to commit robbery and three weapon-related offenses, Petitioner moved for suppression of his second confession to the

---

[4]  The hospital cleared Petitioner for being questioned by the investigator upon concluding that the visit "was medically acceptable" for Petitioner.  Docket Entry No. 20-9, at 4.

[5]  Both Collado and Almanzar pled guilty to the charges of aggravated manslaughter and conspiracy to commit robbery.  Both testified for the State during Petitioner and Leary's trial.

investigator.  After an eleven-day hearing, the trial court held
that the confession was admissible.[6]

More than six months later, in January 2000, trial commenced
against Petitioner and Leary.  The jury acquitted Petitioner of
the murder charge but found him guilty of the remaining offenses.
In light of his criminal history, he was sentenced to life
imprisonment without parole.  The Appellate Division affirmed his
conviction but remanded for resentencing.[7]  The Supreme Court of
New Jersey denied certification.

Petitioner then sought post-conviction relief ("PCR"), which
was denied by the Law Division.  That denial was affirmed by the

---

[6]  Petitioner offered testimony of a non-treating physician
who opined that Petitioner's capacity to confess had to be
impaired since Petitioner "did not know that [his confession] was
going to be used against him and [thus, he subjectively] did not
perceive it as a confession."  See Docket Entry No. 20-9, at 4.
"The State, in turn, produced a non-treating physician who
concluded that [Petitioner] was not cognitively impaired when he
gave his [confession] statement, and whatever [physical] pain
[Petitioner] was experiencing [at the time of his second meeting
with the investigator] did not influence his thinking or his
choices in any way."  Id. at 5 (Appellate Division's decision
agreeing with the Law Division's factual findings that
Petitioner's position as to his mental impairment during the
investigator's visits was less credible than the State's
position, and pointing out that "[t]he record is barren of any
factual support for [Petitioner's] contention" that he "suffered
from any kind of medical condition that would result in his will
being overborne") (internal quotation marks, brackets and
ellipses omitted).

[7]  The same prison term was imposed upon re-sentencing.

Appellate Division, and the New Jersey Supreme Court denied certification.

The Petition at bar followed, and Petitioner was notified of his <u>Mason v. Meyers</u>, 208 F.3d 414 (3d Cir. 2000), rights.[8]

## II.  PETITIONER'S CLAIMS

In addition to the claims raised in his Supplemental Ground, <u>see</u> this Opinion, n.8, Petitioner asserted six original Grounds:

Ground I:         . . . Petitioner's physical condition precluded his competency to stand trial . . . .

Ground II:        Petitioner's physical condition . . . render[ed] him incompetent to give [his confession to the investigator during the second visit].

Ground III:       Petitioner was . . . subjected to ineffective assistance of trial counsel by counsel's failure to call . . . Leary as [witness]. . . .

---

[8]  <u>See</u> Docket Entries Nos. 1 and 2.  Petitioner responded to his <u>Mason</u> notice by an application seeking stay and abeyance. <u>See</u> Docket Entry No. 3.  Conducting a <u>Rhines v. Weber</u>, 544 U.S. 269 (2005), analysis, this Court found stay and abeyance unwarranted, <u>see</u> Docket Entries Nos. 4 and 5, and renewed its <u>Mason</u> notice to Petitioner.  In response, Petitioner sought to amend his Petition by the claims that he "was denied his right[s because] trial counsel failed to argue that [his] statement [to the investigator was] improperly obtained and . . . appellate counsel failed to argue trial counsel's ineffectiveness for failure to investigate or raise [this] issue."  <u>See</u> Docket Entry No. 8 ("Supplemental Ground").  The Court denied that Petitioner's motion to amend as procedurally deficient and substantively meritless and directed Respondents to answer the Petition.  <u>See</u> Docket Entries Nos. 16 and 17; <u>see</u> <u>also</u> <u>infra</u> this Opinion, Section IV(C)(1) (detailing substantive invalidity of Petitioner's Supplemental Ground).  Respondents duly complied, <u>see</u> Docket Entry No. 20, and Petitioner traversed.  <u>See</u> Docket Entry No. 23.

Ground IV:      Petitioner was . . . subjected to ineffective
                assistance of trial counsel by counsel's failure
                to object to . . . [C]ollado and [A]lmanzar
                testifying [while] wearing handcuffs and prison
                garbs . . . .

Ground V:       Petitioner was . . . subjected to ineffective
                assistance of trial counsel by counsel's failure
                to request adequate jury instructions on
                accomplice liability . . . .

Ground Six:     Petitioner was . . . subjected to ineffective
                assistance of trial counsel by counsel's failure
                to request a jury instruction on imperfect
                self-defense . . . .

See Docket Entry No. 1.

## III. STANDARD OF REVIEW

The standard of federal habeas review is long-established,
and it sets forth a narrowly-tailored test.  See Cullen v.
Pinholster, 131 S. Ct. 1388, 1398 (2011) ("As amended by [the
Antiterrorism and Effective Death Penalty Act ('AEDPA'), Pub. L.
104-132, 110 Stat. 1217 (April 24, 1996)], 28 U.S.C. § 2254 sets
several limits on the power of a federal court to grant an
application for a writ of habeas corpus on behalf of a state
prisoner").  Section 2254 permits a federal court to entertain
only claims alleging that a person is held in state custody "in
violation of the Constitution or laws or treaties of the United
States."  28 U.S.C. § 2254(a).

The AEDPA further limits a federal court's authority to
grant habeas relief by providing that, when a state court has
adjudicated a petitioner's federal claim on the merits, a

7

district court "has no authority to issue the writ of habeas corpus unless the [state court's] decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" Parker v. Matthews, 132 S. Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).  Thus, the starting point of federal habeas review is to determine the relevant law clearly established by the Supreme Court.[9]  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions [entered by] the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000); accord Lockyer v. Andrade, 538 U.S. 63, 71 (2003).  A decision is "contrary to" a Supreme Court holding, within the meaning of 28 U.S.C. § 2254(d)(1), if: (a) the state court outright

---

[9]  The only federal law that qualifies as clearly established is Supreme Court precedent interpreting the Constitution.  Federal courts sitting in habeas review may not rely upon non-constitutional Supreme Court decisions to determine whether § 2254(d) relief is appropriate, since precedents not based on constitutional grounds are "off the table as far as § 2254(d) is concerned." Early v. Packer, 537 U.S. 3, 10 (2002) (per curiam). Correspondingly, the courts conducting federal habeas review cannot look to decisions interpreting federal common law.  See id. (holding inapplicable precedents "based on [the Supreme Court's] supervisory power over the federal courts, and not on constitutional grounds").

"contradicts the governing law set forth in [the Supreme Court] cases"; or (b) the state court 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06.  Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at 413.  Notably, under § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (quoting Williams, 529 U.S. at 410).  Correspondingly, the standard posed by federal habeas review "is . . . difficult to meet, [since it is a] highly deferential standard for evaluating state-court rulings, [and that standard] demands that state-court decisions be given the benefit of the doubt."  Cullen, 131 S. Ct. at 1398 (citations and internal quotation marks omitted).

**IV.  DISCUSSION**

　　Petitioner's Grounds present two groups of challenges.  One group (consisting of Petitioner's Grounds One and Two and the elaborations provided in Petitioner's Supplemental Ground) builds on Petitioner's assertion of his almost four-year-long mental

incompetence which, he claims, he experienced as a result of: (a) physical pain he constantly suffered during that entire period; and (b) effects of pain-reducing medications he was consuming during that period.  The other group of challenges consists of Petitioner's attacks on the performance of his trial counsel, as stated in his Grounds Three to Six, and elaborated upon in his traverse.

### A.  **Grounds Three to Six**

#### 1.  **Governing Legal Principles**

The Sixth Amendment, applicable to States through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."  U.S. Const. amend. VI.  Since the right to counsel is the right to an *adequate* assistance of counsel, see Strickland v. Washington, 466 U.S. 668, 686 (1984), rather than a perfect or best possible assistance, a claim that counsel's assistance was so defective as to require reversal of a conviction has two prongs, see id. at 687, and the court need not address both "if the defendant makes an insufficient showing on one." Id. at 697. First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness." Id. at 687-89 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

10

professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions [were so deficient facially that these actions] could never be considered part of a sound strategy"). Then, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting [the defendant's] guilt." Id. at 695.[10]

### 2. Petitioner's Ground Three Warrants No Relief

---

[10] The Strickland test applies to the performances of both trial and appellate counsel. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004). When the issue is appellate counsel's failure to raise specific issues, a petitioner satisfies the first Strickland prong by showing that appellate counsel was "objectively unreasonable [i.e.,] that counsel unreasonably failed to discover [arguably] non frivolous issues and to file a merits brief raising them." Smith v. Robbins, 528 U.S. 259, 285 (2000). An arguably non-frivolous issue is "one that counsel can argue in good faith with some potential for prevailing." Id. Consequently, the general principle established by Smith is that appellate counsel need not raise every non-frivolous issue on appeal; he "may select from among them in order to maximize the likelihood of success on appeal." Id. at 288; see also Jones v. Barnes, 463 U.S. 745, 750 (1983) (rejecting "per se rule that appellate counsel must raise every non frivolous issue").

Petitioner's Ground Three claim presents an "incorporation by reference" of the claim raised during his PCR. So pled, the Ground Three is invalid, since federal habeas rules do not allow pleading through an "incorporation by reference."

"Habeas corpus petitions must meet heightened pleading requirements." McFarland v. Scott, 512 U.S. 849, 856 (1994); see also 28 U.S.C. § 2254 Rule 2(c) (clarifying that a § 2254 petitioner must "specify all the grounds for relief available to the petitioner" and actually "state the facts supporting each ground"). Thus, the Ground Three claim is subject to dismissal on this procedural basis.

In addition, Ground Three is substantively meritless. Petitioner's PCR brief offers a mere speculation that, had Leary testified, he could have stated that Lamb's robbery was not planned, and the July 31, 1996, events were just a "drug deal gone bad," i.e., a story corresponding to the one Petitioner offered during his first meeting with the investigator and admitted to be false during his second meeting with the investigator.[11] As of now, Petitioner failed to provide this

---

[11] Petitioner's PCR record shows that his trial counsel discussed this issue with Petitioner and both concluded that – in light of Collado and Almanzar's admission that Lamb's murder occurred as a result of a pre-planned robbery – calling Leary as a witness could not aid Petitioner, especially since there was no certainty as to what Leary would have actually testified to had he been called to the stand. See Docket Entry No. 20-23, at 16-17. Indeed, it could be hypothesized that Leary, if called to

Court with either Leary's affidavit as to Leary's willingness to testify and as to what Leary's testimony would be.[12]  Nor did Petitioner explain how the jury could find Leary's hypothetical testimony as to such story more credible than the entire body of evidence produced by the State, including Petitioner's own confession, the detailed testimonies of Collado and Almanzar, and even the results of Lamb's autopsy showing thirteen fatal wounds inflicted execution style and, thus, incompatible with any "commotion" or "drug deal gone bad" scenario.  Since Petitioner offered this Court nothing but his bald, self-serving speculations, the Court concludes that it was not an unreasonable strategic election for Petitioner's counsel to avoid calling Leary as a witness.  Accordingly, Petitioner's Ground Three fails to meet both prongs of Strickland.

### 3.  Petitioner's Ground Four Warrants No Relief

Ground Four is procedurally deficient, being a mere "incorporation by reference" of the claim raised during his PCR. That RCR claim: (a) asserts that Petitioner's rights were violated because Collado and Almanzar testified for the State while wearing prison garbs and handcuffs; and (b) relies,

---

testify, would state that Petitioner was the mastermind of the robbery, and that Petitioner intentionally shot Lamb after the robbery, while Leary was merely a driver of a get away car.

[12]  See infra for discussion of Petitioner's traverse, which claims Leary's alleged willingness to produce an affidavit.

primarily, on <u>State v. Artwell</u>, 177 N.J. 526 (2003), a non-retroactively-applicable state-law precedent (entered after Petitioner's conviction) that allowed the witnesses testifying for a criminal defendant to appear in court in civilian clothes. Petitioner's reliance on a non-retroactively-applicable state law renders his Ground Four facially deficient on the merits, <u>see State v. Thompson</u>, 2011 N.J. Super. Unpub. LEXIS 332, at *19-21 (N.J. Super. Ct. App. Div. Feb. 15, 2011) (<u>Artwell</u> is not retroactively applicable on collateral review), in addition to its "incorporation by reference" procedural deficiency.[13]

Moreover, had Ground Four been duly pled and <u>Artwell</u> been retroactively applicable, Petitioner's reliance on that precedent fails to support a federal challenge since "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." <u>Johnson v. Rosemeyer</u>, 117 F.3d 104, 110 (3d Cir. 1997).[14]

---

[13] Petitioner cannot convert <u>Artwell</u> into a retroactively-applicable law by means of § 2254 proceedings since the decisions of state courts as to their state law are conclusively binding on federal courts sitting in habeas review. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions").

[14] Indeed, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." <u>Smith v. Horn</u>, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); <u>see also</u> <u>Smith v. Zimmerman</u>, 768 F.2d 69, 71, 73 (3d Cir. 1985). Moreover, the state law upon which Petitioner relies came about *after* his conviction and related to

14

In addition, Ground Four is meritless under Supreme Court precedent.[15]   Neither the <u>Estelle v. Williams</u> Court, nor any other Supreme Court decision has held that the prohibition on compelling a criminal *defendant* to wear a prison garb or shackles applies to defense *witnesses* or *government* witnesses.   Such absence of Supreme Court precedent renders Petitioner's position not viable.   <u>See</u> <u>Echols v. Ricci</u>, 2011 U.S. Dist. LEXIS 93833, at *103 (D.N.J. Aug. 19, 2011) (addressing a defendant's claim that a defense witness testified while in prison garb and stating, "[l]ack of Supreme Court precedent automatically concludes this Court's review, since a state court's determination cannot be an unreasonable application of the Supreme Court precedent which does not exist) (citing <u>Smith v. Spisak</u>, 130 S. Ct. 676, 684 (2010); <u>Dansby v. Trombley</u>, 369 F. App'x 657, 659 (6th Cir. 2010)), <u>aff'd</u>, 492 F. App'x 301 (3d Cir. 2012); <u>see also</u> <u>Matteo</u>, 171 F.3d at 890; <u>accord</u> <u>Rountree v. Balicki</u>, 640 F.3d 530 (3d Cir. 2011).   Indeed, no extension of the <u>Estelle v. Williams</u>

---

*defense*, not *State's* witnesses, like Collado and Almanzar.

[15]   In <u>Estelle v. Williams</u>, 425 U.S. 501 (1976), the Supreme Court held that, when a criminal defendant *himself* is actually forced to wear a prison garb or shackles during his trial, such signs of restraint violate due process because they might create a prejudice undermining the shackled defendant's presumption of innocence.   <u>See</u> <u>Williams</u>, 425 U.S. at 504-08 (pointing out that it is only a state's compulsion that is prohibited, rather than the actual act of wearing a prison garb or shackles in general, since some defendants elect to use prison garbs or shackles as a tactic: to elicit sympathy from the jury).

15

holding to witnesses could be warranted, since the principal interest protected by the Due Process Clause is the presumption of innocence accorded to criminal defendants: a concern wholly inapplicable to even defense witnesses, see Echols, 2011 U.S. Dist. LEXIS 93833, at *103; McMannis v. Mohn, 163 W. Va. 129 (1979), moreover to State's witnesses.  Finally, it bears noting that Petitioner concedes that it was the State that was prejudiced by allowing Collado and Almanzar to appear in prison garbs and handcuffs because it conveyed they were untrustworthy.[16]

### 4.   Petitioner's Ground Five Warrants No Relief

Petitioner's Ground Five is even more deficient than his Ground Four, since: (a) this Fifth Ground also presents an "incorporation by reference" of the claim raised during PCR; and (b) that incorporated PCR claim was *exclusively* based on state

---

[16]   In fact, Petitioner's PCR brief conceded that point. See Docket Entry No. 20-21, at 10 ("[T]he existence of [Collado/Almanzar's] restraints necessarily conveyed [to the jury] the impression that the [trial] judge regarded [each of these two] State witnesses as a dangerous man, and one not to be trusted, even under the surveillance of officers. . . . [During Petitioner's trial], the testimony of the restrained [State's] witnesses was crucial and significant to the outcome [of the State's case against Petitioner]") (citations, parenthetical and internal quotation marks omitted).  Thus, Petitioner's Fourth Ground, attacking his counsel's election not to object to Collado and Almanzar's prison garbs and handcuffs, necessarily fails to meet both prongs of the Strickland test, since: (a) it was a reasonable strategic choice for Petitioner's counsel not to argue to Petitioner's disadvantage; and (b) Petitioner could not have been prejudiced by the State handing him a litigation advantage.

law.  See Docket Entry No. 20-21, at 13-17 (relying only on State
v. Savage, 172 N.J. 374 (2002); State v. White, 98 N.J. 122
(1984); State v. Weeks, 107 N.J. 396 (1987); State v. Thomas, 76
N.J. 344 (1978); State v. Madden, 61 N.J. 377 (1972); State v.
Fair, 45 N.J. 77 (1965); State v. Harrington, 310 N.J. Super. 272
(N.J. Super. Ct. App. Div. 1998); State v. Bielkiewicz, 267 N.J.
Super. 520 (N.J. Super. Ct. App. Div. 1993); State v. Dissicini,
126 N.J. Super. 565 (N.J. Super. Ct. App. Div. 1974).  Thus,
Ground Five should be dismissed for: (a) failure to assert a
federal violation, see Rosemeyer, 117 F.3d at 110; Horn, 120 F.3d
at 414; Zimmerman, 768 F.2d at 71-73, and (b) failure to exhaust
*federal* challenges in state fora, that is, in addition to
Petitioner's failure to comply with the pleading requirements of
Habeas Rule 2.  Alternately, Ground Five is either meritless or,
if construed leniently, duplicative.[17]

### 5.  Petitioner's Ground Six Warrants No Relief

As is the case with Petitioner's Grounds Three, Four and
Five, Petitioner's Ground Six "incorporates by reference" the

---

[17] Ground Five asserts that Petitioner's counsel violated
his rights by failing to request an accomplice liability charge.
However, Petitioner's PCR brief concedes that the trial judge *did
provide* the jury with an accomplice liability charge.  See Docket
Entry No. 20-21 (conceding this fact but maintaining that the
instruction was "inadequate" because it did not include an
"imperfect self-defense" clause).  Since Petitioner's Ground Six
asserts that his counsel violated his rights because the jury
instructions did not include an "imperfect self-defense" clause,
Petitioner's Ground Five is duplicative of the Ground Six.

claim raised during his PCR.  That PCR claim: (a) alleged "that[,] when the judge instructed the jury as to murder, felony murder, aggravated and reckless manslaughter and self defense[, the judge] failed to explain how the jury could find imperfect self-defense in this particular case [although] the judge instructed the jury on all the lesser included offenses," Docket Entry No. 20-21, at 17; and (b) relies *exclusively* on state law. See id. at 18-20 (referring only to State v. Pitts, 116 N.J. 580 (1989); State v. Bowens, 108 N.J. 622 (1987); State v. Wilbery, 63 N.J. 420 (1973)).  Hence, Ground Six is subject to dismissal for failure to assert a *federal* violation, see Rosemeyer, 117 F.3d at 110; Horn, 120 F.3d at 414; Zimmerman, 768 F.2d at 71-73, for failure to exhaust *federal* challenges in state fora, and for failure to comply with the pleading requirements of Habeas Rule 2.

Moreover, Ground Six is substantively meritless.  Petitioner was not convicted of murder or aggravated manslaughter or reckless manslaughter.  He was convicted of robbery and felony-murder deriving from that robbery.  The New Jersey Code defines felony-murder as follows:

> criminal homicide constitutes murder when . . . [i]t is committed when the actor, acting either alone or  with one or more other persons, is engaged in the commission of, or an attempt to commit . . .  robbery . . . . and in the course of such crime . . . , any person causes the death of a person other than one of the participants.

18

N.J. Stat. Ann. 2C:11-3(a)(3).

Since Petitioner was convicted of Lamb's robbery (and he could not have claimed that he partook in the robbery because of his "imperfect self-defense"), the fact that Lamb was killed necessarily triggered Petitioner's felony murder conviction, even if the jurors could, somehow, find that Leary was the sole shooter of Lamb. Therefore, Petitioner's "imperfect self-defense" claim is wholly inapposite to his attack on the actual offenses underlying his conviction.[18]

---

[18] Furthermore, to the extent Petitioner attacks the jury instructions by asserting that a self-standing, i.e., unrelated to lesser-included offenses, "imperfect self-defense" charge should have been but was not given, his position is meritless. The Due Process Clause is violated only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law." Horn, 120 F.3d at 416; see also In re Winship, 397 U.S. 358, 364 (1970); Sandstrom v. Montana, 442 U.S. 510, 523 (1979). Here: (a) Petitioner's PCR claim did not assert a single essential element of the offenses Petitioner was convicted of where the jury instructions, as given, had lifted the State's burden of proof; and (b) Ground Six, being limited to a mere "incorporation by reference," adds nothing to that deficient PCR claim. Next, where the Supreme Court has not held that a failure to give an instruction is unconstitutional, there is no right to habeas relief. See Spisak, 558 U.S. 139; see also Hopper v. Evans, 456 U.S. 605, 611 (1982); Miller v. Fenton, 474 U.S. 104, 112, (1985). Since the Supreme Court has never ruled that an imperfect self-defense charge is required, Petitioner's Ground Six is also meritless on this basis. Also, in light of the fact that Lamb suffered thirteen lethal wounds, and Collado and Almanzar testified to seeing Petitioner continuously shooting Lamb, execution style, while Lamb was screaming on the ground, Petitioner's counsel's election to avoid seeking a self-standing imperfect-self-defense charge was facially reasonable. Finally, as to the offense of which Petitioner was acquitted, i.e., murder of Lamb, Petitioner's counsel did indeed request, and the trial

Accordingly, Petitioner's Ground Six attack on his counsel's performance fails to meet both prongs of <u>Strickland</u>.

**B.   Challenges Based on Alleged Mental Incapacity**

Petitioner's Grounds One and Two assert that, being released from the hospital, <u>i.e.</u>, three months after being shot by Lamb and even three and a half years after being shot, Petitioner was still suffering of such severe physical pain and was so affected by the pain-reducing medications, that he lacked mental capacity either to make a confession or to stand trial. From that, Petitioner deduces that his confession had to be qualified as involuntary and was wrongly admitted into evidence, and also that he was denied a fair trial since he believes he was insufficiently able to assist his counsel in his defense during his trial.

"[T]he Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules." <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 (1983). The admissibility of evidence is generally a question of state law, which is not cognizable under habeas review. <u>See</u>

---

court did indeed provide, an adequate imperfect-self-defense charge: when the trial judge charged the jurors as to aggravated manslaughter. <u>See</u> <u>Pitts</u>, 116 N.J. 580 (explaining why an imperfect self-defense position raised in connection with a murder charge is not merely compatible with but plainly equal to a request to charge the jury with the lesser-included offense of aggravated manslaughter).

Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A
federal habeas court . . . cannot decide whether the evidence in
question was properly allowed under the state law of evidence");
Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the
contention that the trial court erred in admitting [a certain]
testimony . . . , we find that, if there was any error in the
court's ruling . . . that error was at best one of interpretation
of the state's law of evidence and did not arise to
constitutional dimensions").  Therefore, admission of
Petitioner's confession into evidence could amount to a violation
of constitutional magnitude only if he establishes that the
confession was involuntary.  Here, Petitioner failed to do so.

To determine whether a confession is voluntary, the court
must examine "the totality of the circumstances surrounding
[it]," Johnson v. Pollard, 559 F.3d 746, 753 (7th Cir. 2009)
(citing Miller v. Fenton, 474 U.S. 104, 110 (1985)), including
"the defendant's age, education, intelligence level and mental
state[,] . . . the length of his detention, the nature of his
interrogations, the inclusion of advice about constitutional
rights, . . . the use of physical punishment [and the]
deprivation of food or sleep."  United States v. Brooks, 125 F.3d
484, 492 (7th Cir. 1997).  While a suspect's physical pain or
drug use might be relevant factors, the "suspect's physical pain
or drug use does not make a confession involuntary."  United

21

States v. Walker, 272 F.3d 407, 413 (7th Cir. 2001).  Rather,
"the test for voluntariness . . . is whether the claimed
impairments caused the defendant's will to be overborne."
Brooks, 125 F.3d at 492 ("the [trial] court [reasonably] believed
the assessment of the [investigators] that the defendant gave no
indication of being impaired and, correspondingly, disbelieved
the defendant's testimony that he was [under influence of drugs].
We defer to the [trial] court's credibility determinations and
finding that there was no credible evidence that the defendant
lacked the capacity to make a voluntary statement").

Here, the record demonstrates that Petitioner made his
confession after he was medically cleared for being released –
and, in fact, was released – from the hospital.  Petitioner was
the one who initiated the interview, reaching out to the
investigator, triggering the first visit (conducted upon a
medical clearance establishing his sufficient physical condition
to have it), and he was the one who reached out to the
investigator and triggered the second visit that produced his
confession.  See Docket Entry No. 20-9, at 4.  He was neither
detained nor deprived of sleep or food.  At no point did he claim
that the investigator exposed him to any physical torture or
physical punishment.  Nothing in the record suggests that
Petitioner requested or obtained any mental health treatment
before the investigator's visits.  The state court's factual

finding that his confession was entered with the requisite capacity was reasonable.

A federal court sitting in habeas review is obligated to give deference to determinations of state courts. See Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Moreover, federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Corr. Center, 295 F.3d 361, 368 (3d Cir. 2002). Here, Petitioner did not offer the Court any evidence warranting non-deference.[19] Thus, Petitioner's claim that he was incompetent to make a confession, and that the confession was involuntary, is without merit. Accordingly, Ground Two claim (that his confession was wrongly admitted into evidence) warrants no habeas relief.

Petitioner's other incompetence claim, i.e., that he was incompetent to stand trial, fares no better. "No doubt, "[t]he

---

[19] Petitioner offered this Court no evidence other than: (a) the fact that he had three months of recovery from a physical injury; (b) the fact that he was consuming pain-reducing medications; and (c) a non-treating physician opining that his capacity to confess had to be impaired because he "did not know that the [confession] was going to be used against him and [thus, he] did not perceive it as a confession." See Docket Entry No. 20-9, at 4 (the Appellate Division's decision qualifying such expert opinion as "interesting"). None of these qualifies as sufficient evidence of Petitioner's mental incapacity.

conviction of an accused person while he is legally incompetent violates due process." Pate v. Robinson, 383 U.S. 375, 378 (1966); see also Medina v. California, 505 U.S. 437, 439 (1992). While the test for competence is "whether a criminal defendant has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," Drope v. Missouri, 420 U.S. 162, 172 (1975)(quoting Dusky v. United States, 362 U.S. 402 (1960)), and Petitioner numerously recited this very test in his Ground One, he failed to observe that this Court must be offered actual facts showing that he had no "rational . . . factual understanding of the proceedings against him." Id. In other words, Petitioner was obligated to come forward with "meaningful" or "substantial" evidence of his mental incompetence at the time his trial commenced, i.e., three and a half years after he was shot by Lamb. See Demosthenes v. Baal, 495 U.S. 731 (1990).[20]

Here, the state courts found that Petitioner's mental competence was so evident that "there was simply no basis [for

---

[20] For instance, Petitioner could have offered "evidence of [his] irrational behavior, his demeanor at trial, and any prior medical opinion on [his mental] competence," Drope, 420 U.S. at 180; Mendez, 556 F.3d at 771. Since such evidence appears to exist, Petitioner offered this Court nothing but his conclusory allegation of mental incompetence. However, such self-serving allegations cannot qualify as evidence raising a reasonable doubt concerning his competency to stand trial. See Cacoperdo v. Demosthenes, 37 F.3d 504, 510 (9th Cir. 1994).

the trial judge] to have a hearing to test [Petitioner's] competency to stand trial." Prior to trial, he requested to be transferred to a prison wing where he could have "mobility, [so he would have a place] where [he] could move," Docket Entry No. 20-9, at 5 (thus indicating that Petitioner's pain was not so severe to render him bed-ridden), and his submissions verify that he was clear as to the nature of the charges against him, the nature of the criminal proceedings against him, and that he actively participated in debating the defense strategy, e.g., by suggesting to his counsel to call Leary as a defense witness so to revive the story he offered to the investigator during the investigator's first visit in an attempt to escape the robbery and felony-murder convictions.[21]

Since Petitioner did not offer this Court sufficient evidence contradicting the state courts' factual finding that he was competent to stand trial, his self-serving assertions warrant no habeas relief.[22]

---

[21] The state courts also concluded that Petitioner's conditions of confinement claims raised at the time of his trial, assessed "either individually or collectively," could not have supported a conclusion that he was mentally or physically incapable to stand trial. Docket Entry No. 20-9, at 6.

[22] Petitioner's counsel tried to prevent Petitioner's trial on the grounds of Petitioner's incapacity to stand trial. At the first scheduling order, counsel stated, "I am reserving the right to make a . . . motion concerning [Petitioner's] current medical condition and his ability to stand trial based upon report that has been requested . . . from Dr. Hill. Dr. Hill gave a partial

25

C.   **Residual Aspects**

1.   **Supplemental Ground**

Petitioner's Supplemental Ground attempted to tie
Petitioner's mental incompetence claims to his attacks on his
counsel's performance by asserting that trial counsel violated
Petitioner's rights (since he did not challenge the admissibility
of Petitioner's confession on the grounds of Petitioner's alleged
mental incompetence) and Petitioner's direct appellate counsel
violated his rights by failing to challenge that alleged trial
counsel's failure on appeal.  As to Petitioner's trial counsel,
the allegations in the Supplemental Ground are factually false
since the trial counsel did, indeed, attempt to suppress
Petitioner's confession on the very grounds that Petitioner had
sustained such serious physical injury and pain, including the
effects of medication, that he could not have had sufficient
capacity to confess three months after being shot.[23]

---

report concerning [Petitioner's] medical condition.  He did not
comment on one specific issue though.  I've tried to reach Dr.
Hill . . . and hopefully that issue will crystalize in the next
two weeks."  Docket Entry No. 20-33, at 2.  Because Petitioner's
counsel was never able to obtain sufficient evidence related to
Petitioner's ability to stand trial, Petitioner's trial proceeded
as scheduled.

[23]   See, e.g., Docket Entry No. 20-34, at 9-16 (defense
counsel's examination of the hospital's risk manager as to the
medical clearance for the investigator's first visit with
Petitioner); Docket Entry No. 20-36, at 17-20 (defense counsel's
extensive and vigorous examination of the investigator: inquiring
whether the investigator was aware of Petitioner's "medical

As to Petitioner's claim regarding appellate counsel, the Supplemental Ground claim is legally meritless.  Under <u>Smith v. Robbins</u>, 528 U.S. at 288, an appellate attorney need not raise every possible claim, only those that are non-frivolous.[24]  <u>See also</u> <u>Jones v. Barnes</u>, 463 U.S. at 750.  Since, here, Petitioner's trial counsel did attempt to suppress Petitioner's confession on the grounds of Petitioner's alleged incompetence caused by physical pain/medications, it would have been wholly frivolous of Petitioner's appellate counsel to assert that the trial counsel

---

condition," a possibility that Petitioner had "psychiatric consultations," a possibility that Petitioner was taking any medication that could "alter his [ability to] speak[] to [the investigator]," whether the investigator knew that Petitioner "was about to be discharged [from the hospital]," whether the investigator knew "of the kind of injuries that [Petitioner] suffered from," whether the investigator was "aware . . . that [Petitioner] had abdominal wounds," whether the investigator knew that Petitioner "had surgery," whether the investigator was "aware of the degree of disability that [Petitioner] suffered as a result of [his] wounds," whether the investigator knew that Petitioner was in "critical condition [after being shot]," etc.). Thus, Petitioner's attack on his trial counsel's performance is literally devoid of any factual predicate.  Moreover, since, as the discussion provided <u>supra</u> demonstrates, Petitioner failed to establish a violation of his rights with regard to his core claim that his confession was wrongly admitted into evidence, his Supplemental Ground attack on his trial counsel's failure to obtain suppression of his confession cannot meet, at the very least, the prejudice prong of the <u>Strickland</u> test.

[24]   "Under <u>Anders</u> [<u>v. California</u>, 386 U.S. 738, 744 (1967)], if court-appointed 'counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should . . . request permission to withdraw.'"  <u>United States v. Parker</u>, 2012 U.S. App. LEXIS 14525, at *4 (3d Cir. 2012).

made no such effort.  Thus, Petitioner's attack on his appellate counsel's performance fails to meet both prongs of <u>Strickland</u>.

### 2. Petitioner's Traverse

#### a. *Petitioner's Traverse and Exhibits*

As noted <u>supra</u>, Petitioner traversed to Respondents' answer. <u>See</u> Docket Entry No. 23.  The traverse raises six "grounds," but these "grounds" do not correspond to the Grounds raised in the Petition.[25]  <u>See</u> <u>id.</u>; <u>compare</u> Docket Entry No. 1.  Consequently, this Court construes Petitioner's traverse "grounds" as argument "Points" to be read jointly with his exhibits submitted together with the traverse.

The traverse is accompanied by four exhibits.  <u>See</u> Docket Entries Nos. 23-1 to 23-4.  The first contains documents having no bearing on the issues at hand, <u>i.e.</u>: (a) Petitioner's letter to the Clerk; (b) a notice that Petitioner will be traversing; and (c) a notice that he will be traversing with a delay.

The second exhibit contains: (a) a partially redacted notice executed by a certain prison worker more than a year after Lamb's death and two years prior to Petitioner's trial, reading, "[Patient] is stressing and having a difficult time w[ith] his medical condition.  [Patient opines] he should have an[other

---

[25]   These traverse "grounds" contain two grounds titled No. 4.  <u>See</u> Docket Entry No. 23, at 8 and 10.  Thus, while Petitioner listed "five" traverse grounds, he actually raised six of them.

28

surgery] or he will will [sic] die.  [Patient] reports the medical dep[artment] says this is not a life threatening illness. [Patient] reports he will not kill himself but [opines that] eventually his medical condition will kill him while he is [in prison]"; (b) a notice by the same worker dated two years prior to Petitioner's trial, stating that Petitioner had "stress and depression related to his current situation [and they] discussed different exercises[,] both mental and physical[,] to release stress and anxiety"; (c) two notices by prison workers, executed two months prior to trial and stating that Petitioner was watched for being suicidal over his upcoming "court date and [he opined that he] needed to get out of this one"; and (e) doctor's notes indicating that, two months prior to trial, Petitioner was on a low fat diet and treated with Haldol and Percocet.

The third exhibit has: (a) Petitioner's letter executed five and a half years after his trial, addressed to a PCR attorney and claiming that, at that point in time, "Leary told his counsel to tell [Petitioner's] counsel that he wanted to testify on [his] behalf if [Petitioner would] go to trial" but not stating what Leary would testify to; (b) Petitioner's letter to another PCR attorney, executed seven years after the trial, reminding that Petitioner was treated with Haldol at the time of his trial; (c) Petitioner's letter executed more than nine years after his trial, addressed to yet another PCR attorney and stating that,

29

because Petitioner looked "in poor shape" on certain photos
(taken, presumably, around the time of his trial), he had to be
deemed incompetent to stand trial; and (d) a letter from
Petitioner's trial counsel to Petitioner, executed fifteen months
prior to the trial, informing Petitioner of the prosecutor's plea
offer "to a sentence of thirty years with 15 years to be served
without parole."

The fourth exhibit contains Petitioner's letter to the
Public Defender's Office, seeking replacement of his PCR counsel
since the initial PCR counsel seemingly did not respond to
Petitioner's "letter [that] outlined an issue . . . about a
prescription medication [Petitioner] was taking when he was
interviewed by [the investigator]."

None of these documents suggests that Petitioner was unaware
of the developments in his life or had a problem expressing
himself, or was confused about what occurred on the night of
Lamb's murder, or was ignorant about his upcoming criminal
prosecution, or the nature and seriousness of the charges against
him.

**b.**   ***Most of Traversed Points Are Meritless***

Petitioner's Point One asserts trial counsel's "failure to
postpone [Petitioner's] proceedings for medical evaluation of
[P]etitioner's debilitating medical condition, both physically
and psychologically." <u>See</u> Docket Entry No. 23, at 3-4.  His

Point Two asserts that this Court should take into consideration Petitioner's PCR-time letters raising the issues the state courts dismissed as procedurally defaulted.  See id. at 6-8.

Petitioner's Point Three asserts that he was unaware that he could be sentenced to an extended term of imprisonment if found guilty and, had he known about such possibility, he would have considered the prosecutor's plea offer his counsel duly conveyed to him.  See id. at 8.

Petitioner's Point Four speculates that the prosecutor must have misrepresented to the trial judge Petitioner's physical condition at the time of his confession, and that alleged misrepresentation must have caused the trial court to erroneously deny defense counsel's motion to suppress the confession.[26]  See id. at 8-10.

Petitioner's Point Five maintains that the Law Division erred by not holding an evidentiary hearing to entertain the above-listed Points.  See id. at 10-11.

Finally, his Point Six is limited, in its entirety, to a statement that he "incorporates by reference the [P]etition for writ of habeas of habeas corpus, along with all supporting documents and briefs previously submitted, including [all]

---

[26]  Petitioner's Point Four in the traverse is logically incompatible with his supplemental claim that his counsel did not seek suppression of his confession on the grounds of Petitioner's physical condition at the time of that confession.

'letters' herein and points and authority previously filed." <u>Id.</u>
at 11 (capitalization removed).

All these Points are improperly raised, being barred by
Petitioner's response to the <u>Mason</u> notice.  <u>See</u> <u>Boretsky v.
Ricci</u>, 2012 U.S. Dist. LEXIS 37239, at *12-14 (D.N.J. Mar. 20,
2012) (petitioner's affirmative response to <u>Mason</u> notice bars
post-<u>Mason</u> claims); <u>see also</u> <u>Bell v. City of Phila</u>., 275 Fed.
App'x 157, 160 (3d Cir. 2008) (a litigant cannot plead claims,
state and/or support facts by any non-pleading document, be it
moving papers, an opposition to adversaries' motion, the
litigant's traverse).  Moreover, even if this Court were to
ignore that deficiency, as well as Petitioner's failure to
exhaust these Points in state fora, none of these Points, short
of Point Three, addressed <u>infra</u>, alters this Court's analysis as
to the Petitioner's original Grounds and his Supplemental Ground.

The bulk of these Points present nothing but speculations
that cannot affect this Court's deference to the state courts'
factual findings.  Other than Point Three, these Points reflect
Petitioner's arguments that: (a) he, somehow, is not being
believed that he actually suffered physical pain and was
consuming potent pain-reducing medications at the time of his
confession; and (b) had his trial been postponed until his
physical pain further reduced, the outcome of his trial would
have been different.  Both impressions are unavailing.  The

underlying record indicates that, at no point, the Law Division, the Appellate Division, the defense counsel, the prosecutor or this Court ever doubted that Petitioner experienced substantial physical pain and had to consume strong pain-reducing medications at the time of his confession and for a few years after. However, those facts did not render Petitioner mentally incompetent (or his confession involuntary) for the purposes of the totality-of-factors analysis detailed <u>supra</u>.

Moreover, none of Petitioner's voluminous submissions suggests that the outcome of his trial would have been different had his trial been postponed until his physical pain reduced. The State's evidence against Petitioner was overwhelming at the time of his trial and would have been the same at any later point. The facts of Lamb's planned robbery by Collado, Almanzar, Leary and Petitioner were established in great detail,[27] leaving no doubt that Petitioner was a part of that plan. An innocent

---

[27]   Even people unrelated to Lamb's robbery provided details consistent with the picture the State proffered. For instance, Collado told Lamb that he would sell him cocaine for $19,000 and directed Lamb to come along. Lamb, however, arrived together with his girlfriend, causing Collado to direct Lamb to drop the girlfriend on the way to Almanzar's apartment complex (where Petitioner and Leary were hiding in the bushes). Lamb complied, and his girlfriend verified that part of the account. Moreover, she verified that, at Lamb's directive, she put $15,000 in cash in the bag Lamb had with him at the time of his murder. That amount, <u>i.e.</u>, $15,000, was the very sum divided by Leary between himself, Petitioner, Collado and Almanzar. <u>See</u> <u>supra</u>, notes 2 and 3.

passer-by who, for no reason, was wondering through the bushes next to Almanzar's apartment complex at the pre-dawn hour when he was shot by Lamb. There is also no dispute that Lamb was killed, execution style, during the course of that robbery. Petitioner's attack on the timing of his trial is without merit.

In sum, short of Petitioner's Point Three, all Petitioner's traversed arguments and attached exhibits fail to alter the conclusion that Petitioner's claims warrant no habeas relief.

### c.   *Traversed Point Three*

The foregoing leaves this Court solely with Petitioner's traversed Point Three asserting that Petitioner was unaware of his sentencing exposure at the time he rejected the prosecutor's plea offer. Applying the <u>Strickland</u> test to an analogous allegation, the Court of Appeals "held in <u>United States v. Day</u>, 969 F.2d 39 (3d Cir. 1992), that a petitioner who turned down an advantageous plea offer before trial and later was convicted might be entitled to accept the offer even after trial if he rejected the offer because of constitutionally deficient advice from an ineffective attorney." <u>Ramseur v. Beyer</u>, 983 F.2d 1215, 1241 (3d Cir. 1992) (citing <u>Day</u> which, in turn, relied on <u>Strickland</u> and <u>United States v. Morrison</u>, 449 U.S. 361 (1981)). In other words, if a petitioner establishes, rather than merely asserts, his counsel's failure to advise him as to his maximum sentencing exposure in connection with the petitioner's rejection

34

of the plea deal, that petitioner: (a) satisfies the first prong of the Strickland test, see Day, 969 F.2d 39; but he still (b) must meet the second Strickland prong by establishing prejudice. See Day, 969 F.2d 39; Aeid v. Bennett, 296 F.3d 58, 62 (2d Cir. 2002) (a habeas petitioner is required to show reasonable probability that he would have accepted a plea bargain if he had been accurately informed of sentencing ranges he faced upon a plea and upon conviction after trial); see also Purdy v. United States, 208 F.3d 41, 49 (2d Cir. 2000) (to show prejudice under Strickland, a habeas petitioner "must demonstrate a reasonable probability that but for [his defense counsel's] deficiencies, [he] would have plead guilty"); accord Hill v. Lockhart, 474 U.S. 52, 58-59 (1985) (setting forth the threshold test).

Here, Petitioner's traversed Point Three, while undoubtedly improperly raised, still warrants further review.  At this juncture, Petitioner offered this Court nothing but his bald assertion that his counsel failed to advise him about his maximum sentencing exposure and, regardless of Petitioner's prior criminal history, Petitioner was unaware of the sentence enhancement he could face.  Respondents were neither aware of nor had an opportunity to answer that claim or a reason to provide this Court with the relevant record, e.g., such as Petitioner's counsel's affidavit, written exchanges between Petitioner and his counsel, or other evidence.

35

Thus, while dismissing all Petitioner's challenges raised in his Petition, his claims raised in post-pleading motions and his Points One, Two, Four, Five and Six raised in his traverse, this Court will nonetheless retain its jurisdiction over this matter and will direct supplemental briefing as to the Point Three.

This Court's determination as to whether an evidentiary hearing is warranted as to Point Three will be reserved, subject to resolution upon the parties' supplemental briefing.  In conjunction with the same, this Court's determination as to whether counsel should be appointed to Petitioner for the limited purpose of conducting such evidentiary hearing will also be reserved.

**V.   CONCLUSION**

For the foregoing reasons, all Petitioner's challenges, short of his Point Three allegation raised in the traverse, will be conclusively dismissed.  The parties will be directed to brief Point Three.  The issue of whether a certificate of appealability should issue will not be reached, as it is  premature.

> The Clerk will be directed to administratively
> terminate this matter [so to provide the parties with
> an ample time to file their supplemental briefs]; the
> Court will order reopening of this action upon receipt
> of Respondents' answer . . . and Petitioner's filing of
> his traverse -as to the Point Three claim].  No
> statement made in this Opinion or in the Order filed

36

herewith shall be construed as withdrawal of this
Court's jurisdiction over this matter.[28]

Williams v. Ricci, 2012 U.S. Dist. LEXIS 177857, at *69 and n.30

(D.N.J. Dec. 14, 2012) (footnote in original).

An appropriate Order follows.


                                   s/Renée Marie Bumb
                                   **RENÉE MARIE BUMB**
                                   **United States District Judge**

Dated:  July 31, 2014

_____

[28] The courts agree that "an administrative closing has no
effect other than to remove a case from the court's active docket
and permit the transfer of records associated with the case to an
appropriate storage repository." Lehman v. Revolution Portfolio
LLC, 166 F.3d 389, 392 (1st Cir. 1999).  The Court of Appeals
also discussed the tool of administrative termination with
approval, noting its use for the purposes of effective case
management. See Penn W. Assocs. v. Cohen, 371 F.3d 118, 126-28
and n. 9 (3d Cir. 2004); see also Mercer v. Allegheny Ludlum
Corp., 132 F.R.D. 38, 38-39 (W.D. Pa. 1990), aff'd, 931 F.2d 50
(3d Cir. 1991) (expressing the same sentiment).  Moreover, the
Penn Court: (a) suggested that a district court's resort to the
tool of administrative termination is indicative of the
district's tidy docket management, see id. at 128 (noting that
the "Lehman's view of administrative closings has been followed
by the Courts of Appeals for the Tenth and Eleventh Circuits" and
citing, inter alia, the concurrence language in American Heritage
Life Ins. Co. v. Orr, 294 F.3d 702, 715 (5th Cir. 2002), which
observed that "administrative closure reflects nothing more than
the federal courts' overarching concern with tidy dockets"); and
(b) concluded its assessment of the tool with the following
unambiguous endorsement: "[administrative termination is] a
device that, when used in correct context, enhances a district
court's ability to manage its docket."  Id.